WALLIS *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY
COMPANY.

Opinion delivered February 3, 1906.

RAILROAD—NEGLIGENCE—DIRECTING VERDICT.—It was error, in an action
against a railroad company for the negligent killing of a switchman
caused by the derailment of a car at a certain curve, to direct a verdict
for defendant where it was proved that there were such defects in the
track at such curve as would have justified a finding that they caused
the derailment of the car, and that the defendant's trackman knew of
their existence before the accident, and where there was no evidence
that the switchman was guilty of contributory negligence, or that
he assumed such risk.

Appeal from Johnson Circuit Court; WILLIAM L. MOOSE,
Judge; reversed.

*Sam R. Chew,* for appellant.

A case should not be withdrawn from the jury unless it can
be said as·a matter of law that no recovery could be had upon
any reasonable view of the facts which the evidence tends to
establish. 71 Ark. 447. There was evidence from which the jury
might have found the defendant guilty of negligence in maintain-
ing its tracks.

*Oscar L. Miles,* for appellee.

The burden of proof was on plaintiff to negative the pre-
sumption that the tracks were not defective, or, if so, that de-
fendant had no notice of it, or was not negligently ignorant of it.
Thompson, Neg., 1053; Wood, Master and Servant, § 382;
Shearman & Redfield, Neg., § 99; 46 Ark. 569. Deceased, by
virtue of his employment and his knowledge and familiarity with
the condition of the track, assumed all the risk incident to his
employment. 46 Ark. *supra;* 122 U. S. 189; 54 Ark. 389; 48
Kan. 654; 47 Ill. App. 200; 97 Mich. 265; 152 Ind. 392; 134
Ind. 625; 138 Ind. 496. It was proper to direct a verdict for
defendant. 57 Ark. 461.

BATTLE, J. This action was brought by Nettie Wallis, as
administratrix of J. C. Wallis, deceased, against St. Louis, Iron
Mountain & Southern Railway Company to recover damages on
account of the killing of plaintiff's intestate, while he was in the
employment of the defendant as a switchman in its yards at Coal

Hill, Arkansas. She alleged in her complaint that her "intestate came to his death in defendant's said yards at Coal Hill by and through the carelessness and negligence of the defendant," and charges negligence against it because it "negligently managed, kept and maintained its railway tracks in said yard over which the plaintiff's intestate was bound to pass in the discharge of his duty as such switchman so as to allow and permit the outside rail in said track at a curve in said yard to become *too high and out of line,*" and "permitted the flanges on the wheels or tracks of said car to become too sharp and worn." These allegations were denied by the defendant in its answer.

When plaintiff had completed the introduction of her evidence in the trial of this action, the court, on motion of the defendant, instructed the jury to return a verdict in its favor, which they did, and the plaintiff appealed.

In *Catlett* v. *Railway Company,* 57 Ark. 461, this court said: "When the whole case appears to have been developed—that is, the plaintiff has adduced evidence tending to prove all the facts obtainable to sustain his complaint—and the undisputed evidence is so conclusive that this court would be compelled to reverse the judgment based upon a verdict in its favor, the court should withdraw the case from the jury, and direct a verdict for the defendant."

It was proved that J. C. Wallis was at the time of his death in the employment of the appellee, and was foreman of the switch engine at Coal Hill in this State. He was killed, while he was on a train of appellee in the discharge of his duties, by the cars running off the track at Coal Hill. The cars left the rails at a point where there was a considerable curve in the track.

J. F. Hill and A. N. Stanfield, section foremen of appellee, whose business it was to look after and keep in repair certain parts of the track of appellee's railway, testified in the trial of this action. Hill testified as follows:

"I live at Coal Hill; have lived there a year. I am section foreman for St. Louis, Iron Mountain & Southern Railway. I was acquainted with Mr. J. C. Wallis. He was foreman of the switch engine. I was section foreman over three miles east of Coal Hill, two miles west of Coal Hill, and the yards. Mr. Wallis was killed six feet off the yards—six or seven. Mr. Stanfield

had charge of that part of the track over which the train was passing that caused his death. I did not make an examination of the track that morning; I went and worked on it some.

"Q. Did you know the exact spot where the train left the rails?

"A. Six or seven feet from the head-block; I saw a scar that indicated that the wheel had been on top of the-rail.

"Q. Which side of the track did the wheel leave the rail first?

"A. On the outside of the curve, the north rail.

"Q. Did you make any examination of the track at that place?

"A. Yes, sir.

"Q. What examination did you give the track to find out the cause of the wreck?

"A. Now, sir, I could not tell you; I raised the track about two or three inches; I don't know whether I raised it three inches or not; I raised it two or three inches.

"Q. Which rail did you raise?

"A. Inside of the curve.

"Q. Why?

"A. Because it was a little lower than it should have been.

"Q. How came you to discover it?

"A. A man that is engaged in that department ought to know, and it was a little out of line.

"Q. How much out of line?

"A. Two or three inches out of line; away from where the wheel left the track a little ways, and right where it left the rail, it was out of line a little, and I raised it on down three or four rails.

"Q. Now, Mr. Hill, what do you mean by raising the track? Do you mean to tell the court and jury that you raised the complete track, or both rails?

"A. The inside rail; that is the only rail I raised.

"Q. How much did you raise it right on the spot where this injury occurred?

"A. My best knowledge is about two inches.

"Q. Would that be the north rail?

"A. No, sir, the south rail.

"Q. Now, you have also testified about the track being partially or slightly out of line; how far west of that did you find the track out of line?

"A. It was out of line about two or three rails.

"Q. How far was the track out of line next to the head-block?

"A. About an inch and a half. Here was the head-block; about six feet from the head-block the wheels left the rails on this side, and there it jumped the track, and the cars behind this ran on down. I commenced down here, and raised the south side about three or four rails, and I threw this in line here, I reckon, an inch and a half. * * *

"Q. Tell the court and jury how you discovered that track being out of line.

"A. By looking at it.

"Q. I will ask you if you have an instrument you call a gauge to level the track up?

"A. We have, but it does not show but three inches; the gauge is on the level board, and if you go over three inches it don't show it.

"Q. Did you put the level board on that track?

"A. Yes, sir.

"Q. What did you find?

"A. Found about five inches elevation.

"Q. When you first got there, you found one of the rails was elevated about five inches?

"A. About three or four rails were elevated.

"Q. Was the track in a proper condition at that time?

"A. No, sir; it was some out of shape.

"Q. And the track being out of line could have been discovered by a man that was familiar with that work?

"A. Yes, sir. But us fellows on the road can't pay attention to all these places out of line. If we have any knowledge about track, we can look at a piece of track and tell whether it is out of line or not.

"Q. If he was capable of keeping up track, could he look at it and tell it was out of line?

"A. Of course, he could.

"Q. What degree of curve is that?

"A.    I don't know that it was ever measured, but in my state-
ment it is 8 or 10 degree curve.   I have been railroading about
nine or ten years in the track department; have been section
foreman since the latter part of 1895.   The track in the condition
it was at that time would not have been safe to run twenty-five
or thirty miles an hour. * * * I don't know how long this track
has been in that condition; it was not on my work; I think I
noticed it before that time; it is a wet place; I think it is low now.
I don't know how long before the day Mr. Wallis was killed
that I observed the track in that condition; I think I had observed
it in that condition before; that was on Mr. Stanfield's work; I
did not tell Mr. Stanfield of its condition, or any one else.   I knew
that it was in that condition two or three days before the acci-
dent."

Stanfield testified as follows:

"Q.    Tell the jury whether or not, where this car went off,
whether the track was in line.

"A.    I guess it was not exactly.

"Q.    How much out of line was it?

"A.    I suppose probably about half an inch.

"Q.    What should be the difference between the height of
the rails?

"A.    Three inches—my instructions from the roadmaster.

"Q.    Which side?

"A.    The outside.

"Q.    Did you put a level on it that morning?

"A.    No, sir; about a week before.

"Q.    You say possibly it was half an inch or an inch out
of line?

"A.    Half an inch or an inch.

"Q.    How far did that condition out of line extend?

"A.    About sixty feet, I believe.

"Q.    Which way?

"A.    To the north.

"Q.    That is, you would call back towards the switch-stand
north?

"A.    I noticed the track being out of line the day before the
accident occurred."

The only defects in the track where the cars were derailed

were, it was out of line two or three inches, and the north rail was too high, which is shown by the fact that it was necessary to raise the south rail two or three inches. But it is difficult to understand how the latter defect could have caused the derailment of the cars, as they left the track on the north side. It is also difficult to understand why a train running eight or ten miles an hour, or at a reasonable speed, on rails in line and at a proper relative height with no obstruction in its way, could leave the track. An examination of the track showed no cause for its leaving except the defects. The jury might have reasonably inferred that one or both of these defects were the cause.

Two of appellee's section foremen discovered, before the accident, that its track in the sharp curve was out of line. This was evidence for the jury to consider in determining whether appellee was guilty of negligence in failing to maintain its track in a safe condition.

· The burden of proving that Wallis was guilty of contributory negligence rested upon appellee; and there was no evidence that he knew, or ought to have known, of the defects in the track of the railway, and assumed or ought to have avoided the risks incident thereto.

The court erred in directing the jury to return a verdict in favor of the defendant.

Reversed and remanded for a new trial.